**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SHEILA GRADY,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | Civil Action No. 3:24-cv-1207 |
| | § | |
| | § | |
| **DEAF ACTION CENTER.** | § | |
| | § | |
| *Defendant.* | § | |

---

**DEFENDANT'S BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

---

*/s/ Kristin L. Bauer*

Kristin L. Bauer
Texas State Bar No. 24006813
kristin.bauer@jacksonlewis.com
Keshia N. Barnes
Texas State Bar No. 24089010
keshia.barnes@jacksonlewis.com
Justin Sassaman
Texas Bar No. 24143383
Justin.sassaman@jacksonlewis.com

Jackson Lewis P.C.
500 N. Akard Street, Suite 2400
Dallas, Texas 75201
Telephone:    (214) 520-2400
Facsimile:    (214) 520-2008

**ATTORNEYS FOR DEFENDANT**

# TABLE OF CONTENTS

DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ...... 1

I.     STATEMENT OF ISSUES ............................................................................................ 1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................ 1

    A.    Deaf Action Center is Committed to Preventing Discrimination and Retaliation in the Workplace and Provides a Complaint Procedure to Address Such Complaints ......................................................................................... 1

    B.    Grady's Employment at DAC .............................................................................. 2

    C.    Access Specialist Role at DAC ........................................................................... 3

        1.    Communications with Hard of Hearing Clients ............................................. 3

    D.    The Office of Deaf and Hard of Hearing Services Contract .................................. 6

    E.    Disciplinary Incidents Begin to Compile in August 2019, and do not Abate Until Grady was Placed on Administrative Leave in November 2024 .................. 8

    F.    Grady's Claims of Disability Discrimination are Based on Incidents Where She was Either Unsatisfied with the Provided Interpreters or Did not Want to Communicate in Written English with Clients ..................................................... 14

III.    SUMMARY JUDGMENT STANDARD ...................................................................... 16

IV.    AUTHORITIES AND ARGUMENTS ......................................................................... 17

    A.    DAC Did Not Discriminate Against Grady Based on Her Disability ................. 17

        1.    Grady Cannot Establish a *Prima Facie* Case of Disability Discrimination. 17

        2.    DAC Acted on the Basis of Legitimate Reasons with Respect to the Administrative Leave/Failure to Reinstate ................................................... 20

    B.    DAC Accommodated Grady .............................................................................. 22

        1.    Legal Standard for Failure to Accommodate ............................................... 22

        2.    Grady Was Not Without Interpreters for Trainings and Presentations ........ 23

        3.    Grady Had Tools to Communicate with Clients .......................................... 24

4. Providing Grady an ASL Interpreter Would Create an Undue Hardship for DAC ........................................................................ 27

C. DAC Did Not Retaliate Against Grady for Requesting a Reasonable Accommodation ........................................................................ 28

1. Grady Cannot Establish a Prima Facie Case of Retaliation ........................ 29

2. DAC Placed Grady on Administrative Leave for a Legitimate Reason ...... 30

D. Reinstatement is Not Feasible ................................................................. 33

E. The Rehabilitation Act and Texas Labor Code Claims Fail ................................ 34

V. CONCLUSION ........................................................................................... 35

# TABLE OF AUTHORITIES

<u>**DEFENDANT'S BRIEF IN SUPPORT OF ITS**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Pursuant to Federal Rule of Procedure 56 and Local Rule 56.3, Defendant Deaf Action Center ("DAC" or "Defendant") files this Brief in Support of its Motion for Summary Judgment, requesting that the Court grant DAC complete summary judgment on all of Plaintiff Sheila Grady's ("Grady") claims in this lawsuit.

## I.     STATEMENT OF ISSUES

This is an employment discrimination and retaliation case brought by current employee, Plaintiff Sheila Grady ("Grady"). On November 11, 2024, Grady was placed on administrative leave. In her Complaint, Grady brings claims pursuant to state and federal law for disability discrimination, including failure to accommodate, and retaliation. As set forth herein, DAC at all times acted on the basis of legitimate, business reasons with respect to decisions impacting Grady's employment, and her claims should be dismissed.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.     <u>Deaf Action Center is Committed to Preventing Discrimination and Retaliation in the Workplace and Provides a Complaint Procedure to Address Such Complaints</u>**

DAC is a small non-profit organization, currently with no more than 15 employees, serving the needs of people who are deaf and hard of hearing in the DFW area. (App. 02, Hughes Decl. ¶ 3). DAC's mission is to provide those who are deaf and hard of hearing the means to ensure advancement through education, good health, and economic security. (App. 02, Hughes Decl. ¶ 3). DAC's services include providing coping skills for those losing their hearing; educating and assisting in the areas of advocacy and communication services; counseling; and instruction in American Sign Language ("ASL"). (App. 02, Hughes Decl. ¶ 3). Almost all – more than seventy-

five percent – of DAC's employees are deaf or hard of hearing, and one hundred percent are fluent in American Sign Language. (App. 02, Hughes Decl. ¶ 3).

DAC is firmly committed to maintaining a work environment free from discrimination and retaliation. (App. 03, Hughes Decl. ¶ 4). To this end, DAC maintains policies prohibiting unlawful discrimination and harassment in its Equal Employment Opportunity and Anti-Harassment Policy. (App. 03, Hughes Decl. ¶ 4). These policies are distributed and made available to all employees and were provided to Grady. (App. 03, Hughes Decl. ¶ 4). Employees who believe they have experienced unlawful discrimination, or harassment may bring the matter to the attention of the Executive Director, Board of Directors, President, or Human Resources. (App. 03, Hughes Decl. ¶ 4). DAC's policy is to thoroughly investigate any reports of suspected violations. (App. 03, Hughes Decl. ¶ 4). Further, DAC prohibits retaliation against employees who complain of discrimination or harassment. (App. 03, Hughes Decl. ¶ 4). DAC also provides reasonable accommodations to qualified individuals with a disability unless the accommodation would pose an undue hardship. (App. 03, Hughes Decl. ¶ 4). DAC also expects employees, pursuant to DAC's code of ethics, to engage with each other in a respectful manner, maintain standards of confidentiality, and exercise sound business judgment. (App. 03, Hughes Decl. ¶ 4).

**B.**   **Grady's Employment at DAC**

Grady began working for DAC as a Deaf and Hard of Hearing Access Specialist ("Access Specialist") at the Fort Worth, Texas office on September 1, 2011.[1] (App. 03, Hughes Decl. ¶ 5). Grady most recently reported to Salerno Martinez ("Martinez"), Director of Operations, who is deaf. (App. 03, Hughes Decl. ¶ 5). Martinez, in turn, reports to Heather Hughes ("Hughes"), Executive Director, who is also deaf. (App. 03, Hughes Decl. ¶ 5).

---

[1] In or around 2013, DAC changed the title of Deafness Resources Specialist to Deaf and Hard of Hearing Access Specialist. The duties remained the same.

By way of background, Hughes started at DAC in 2004 working in the same role as Grady, an Access Specialist. (App. 03, Hughes Decl. ¶ 6). In 2015, Hughes was promoted to the Executive Director position, while Grady remained in the Access Specialist role. (App. 03, Hughes Decl. ¶ 6).[2]

## C.      Access Specialist Role at DAC

The Access Specialist is responsible for addressing the unique communication needs and issues of persons who are deaf or hard of hearing. (App. 04, Hughes Decl. ¶ 7). As the first person a client encounters during intake, it is extremely important for the Access Specialist to promote communication accessibility. (App. 04, Hughes Decl. ¶ 7). The Access Specialist's primary role is educating clients. (App. 04, Hughes Decl. ¶ 7). The Access Specialist is expected to instill confidence in clients to ask about services and accommodations for equality and effective communication; encourage clients to speak up for their needs; and teach clients about laws that prohibit discrimination. (App. 04, Hughes Decl. ¶ 7). The essential duties of the role include, among others, assessing the needs of deaf and hard of hearing clients; educating clients about their legal rights and how to navigate the interactive process; being able to effectively communicate in written English to communicate with hard of hearing clients; and maintaining compliance with all DAC policies, procedures, and requirements. (App. 04, Hughes Decl. ¶ 7).

### 1.   Communications with Hard of Hearing Clients

To promote communication accessibility, Access Specialists must engage in direct, clear, and effective communication with hard of hearing clients. (App. 04, Hughes Decl. ¶ 8). Communications between hard of hearing clients and Access Specialists must be based on the hard of hearing client's needs, language, and literacy levels. (App. 04, Hughes Decl. ¶ 8). To meet this

---

[2] As Executive Director, Hughes' duties include mitigating risks; managing fiduciary responsibilities; and overseeing the operations of the organization.

standard, Access Specialists must communicate in written English when interacting with hard of hearing clients. (App. 04, Hughes Decl. ¶ 8). Interpreters are not appropriate during interactions with hard of hearing clients because many hard of hearing clients do not understand or use American Sign Language ("ASL"). (App. 04, Hughes Decl. ¶ 8). Further, hard of hearing clients struggle to hear interpreters, and lip reading is highly unreliable for effective communication. (App. 04, Hughes Decl. ¶ 8).

Often, when a hard of hearing client visits DAC for the first time, the client has recently lost their hearing and is trying to process such a loss. (App. 04, Hughes Decl. ¶ 9). Therefore, these initial communications are delicate and introducing an interpreter during these exchanges is often ineffective because it complicates communication and exacerbates the grieving process of losing their hearing. (App. 04, Hughes Decl. ¶ 9). Communication between the Access Specialist and hard of hearing client will not be effective if an ASL interpreter is used solely for the benefit of the Access Specialist. (App. 04, Hughes Decl. ¶ 9). Moreover, some clients, especially those from mainstreamed educational backgrounds—prefer English based communication and find written exchanges to be more natural. (App. 04, Hughes Decl. ¶ 9).

Additionally, ASL interpreters introduce a third-party dynamic that may affect rapport, confidentiality, or client comfort – particularly in sensitive advocacy scenarios. (App. 05, Hughes Decl. ¶ 10). Further, scheduling interpreters can delay service provided to the hard of hearing client. (App. 05, Hughes Decl. ¶ 10). Written communication provides a quicker follow-up. (App. 05, Hughes Decl. ¶ 10). It improves clarity, efficiency, and documentation. (App. 05, Hughes Decl. ¶ 10). Overall, it supports the Access Specialist's role in providing direct and individualized services. (App. 05, Hughes Decl. ¶ 10).

Occasionally, DAC provides assistance to hearing individuals who are not fluent in ASL, such as the parent of a deaf or hard of hearing child. (App. 05, Hughes Decl. ¶ 11). To foster effective communications in such instances, all DAC employees have access to video phones that utilizes Video Relay Service ("VRS"). (App. 05, Hughes Decl. ¶ 11). This service is provided by the federal government for making phone calls with ASL interpreters. (App. 05, Hughes Decl. ¶ 11). DAC employees can utilize this service from anywhere, even the comfort of their homes. (App. 05, Hughes Decl. ¶ 11). DAC employees only need to schedule a meeting with the client and use their video phone to make the call. (App. 05, Hughes Decl. ¶ 11). Additionally, DAC employees have access to apps such as Wavello. (App. 05, Hughes Decl. ¶ 11). This allows DAC employees and clients to see each other while utilizing an ASL interpreter. (App. 05, Hughes Decl. ¶ 11). Further, captions can be turned on for hard of hearing clients when using the virtual platforms including VRS, so that everyone can benefit from the communication preferences of their choice. (App. 05, Hughes Decl. ¶ 11).

As noted, all DAC employees are fluent in ASL. (App. 05, Hughes Decl. ¶ 12). Therefore, if an Access Specialist who is deaf, like Grady, needs to communicate with a client who is fluent in ASL, written English or ASL could be used by both participants for direct communication, whether that communication takes place in person or virtually. (App. 05, Hughes Decl. ¶ 12).

For in office staff meetings, because DAC employees have various levels of hearing loss, DAC encourages communication among DAC employees in ASL without the use of an interpreter. (App. 06, Hughes Decl. ¶ 13). Given the community that DAC serves, and how deeply deaf culture is tied to ASL, the expectation is that employees must be fluent in ASL to work at DAC. (App. 06, Hughes Decl. ¶ 13). As a practical matter, there is a nationwide shortage of sign language interpreters, which are typically booked in advance anywhere from three to four days up to four

weeks.[3] (App. 06, Hughes Decl. ¶ 13). To reserve interpreters for a staff meeting would always require two people at a two hour minimum, and that is an undue hardship for the agency, particularly when all employees are able to communicate in ASL without the use of interpreters. (App. 06, Hughes Decl. ¶ 13).

## D.     The Office of Deaf and Hard of Hearing Services Contract

DAC is funded in part by the Office of Deaf and Hard of Hearing Services ("ODHHS") through an ODHHS Specialist Contract ("Specialist Contract"). (App. 06, Hughes Decl. ¶ 14). The current contract has been in place since 2020 and is up for renewal every four years. (App. 06, Hughes Decl. ¶ 14). Since that time, if not before then, DAC has been increasing its focus – consistent with the current Specialist Contract and other donor requirements – to client centered advocacy, which at its heart involves empowering clients to make informed decisions for themselves rather than creating co-dependent relationships with clients and doing things for them. (App. 06, Hughes Decl. ¶ 14). During that time, DAC has also focused more on working collaboratively with community partners, such as employers, to educate rather than focusing on compliance through legal action. (App. 06, Hughes Decl. ¶ 14).

ODHHS is one of DAC's largest funders. (App. 06, Hughes Decl. ¶ 15). The award from the Specialist Contract funds the compensation of the Access Specialist positions at DAC. (App. 06, Hughes Decl. ¶ 15). DAC receives the funds from the Specialist Contract for Access Specialists' compensation by reimbursement based on the number of individuals served by the Access Specialists. (App. 06, Hughes Decl. ¶ 15). If the Access Specialist(s) is not serving the number of individuals specified by the State, that creates difficulty for DAC in funding the Access Specialist role. (App. 06, Hughes Decl. ¶ 15).

---

[3] https://lsa.inc/why-is-there-a-shortage-of-certified-american-sign-language-interpreters/

As a grantee, there are several rules DAC must follow. (App. 07, Hughes Decl. ¶ 16). For example, Section 2.2.2 of the Specialist Contract requires DAC, to "[d]emonstrate neutrality and offer multiple options where available and appropriate, when referring entities and clients to products and services such as assistive equipment, interpreter and captioning services, etc." (App. 07, Hughes Decl. ¶ 16). With respect to client-centered advocacy, Section 10.2.1.1 requires DAC to "[u]tilize a client-centered approach to provide advocacy services, empower clients to advocate for themselves and provide information to enable clients to make informed decisions on actions to take." (App. 07, Hughes Decl. ¶ 16). With respect to interpreter services, Section 11.1.4 requires DAC to "[n]ot assume an entity's responsibility for providing interpreting or CART services for an entity's service provision responsibilities." (App. 07, Hughes Decl. ¶ 16). Under Section 11.1.5, the Access Specialist should not "provide advocacy services outside the realm of ensuring effective communication." (App. 07, Hughes Decl. ¶ 16).

Moreover, the State has provided an annual training to DAC's Access Specialists, including Grady, since at least 2021, on the Specialist Contract requirements. (App. 07, Hughes Decl. ¶ 17). Examples of annual state trainings are attached as Exhibits A-21 and A-22. The trainings consistently focused on contract requirements such as neutrality, confidentiality, client-centered advocacy, and the need to foster independence for clients through education before resorting to legal action. (App. 07, Hughes Decl. ¶ 17). The training specifically notes that case management for Access Specialists does not mean engaging in any of the following activities: "[i]nterpreting," "[i]n-depth case management or service coordination," "creating dependence on the RS" (RS means Access Specialist in this context), or "[t]aking over for the client or for other entities." (App. 07, Hughes Decl. ¶ 17). As for neutrality, any exception must be approved by the Executive Director, will be rare, and is limited to exceptional circumstances. (App. 07, Hughes

Decl. ¶ 17). In addition to the State training, DAC has provided ongoing coaching, instruction, and training to Access Specialists related to these concepts, including but not limited to a training on neutrality conducted on March 23, 2022. (App. 07, Hughes Decl. ¶ 17).

**E.** **Disciplinary Incidents Begin to Compile in August 2019, and do not Abate Until Grady's was Placed on Administrative Leave in November 2024**

Throughout her time at DAC, Grady exhibited several work performance and conduct issues. (App. 08, Hughes Decl. ¶ 18). For example, on August 31, 2019, Grady received a written warning for combative behavior towards employees and creating hostile work relationships with staff. (App. 08, Hughes Decl. ¶ 18). On November 5, 2021, Martinez communicated with Grady about concerns of low performance, neutrality, and communication. (App. 08, Hughes Decl. ¶ 18). On November 11, 2021, Grady was given a written warning for not meeting expectations regarding trainings and was provided a guideline for future presentations. (App. 08, Hughes Decl. ¶ 18). On November 30, 2021, Grady received a written warning for failing to train her clients on topics such as laws that prohibit discrimination or the necessary follow through when requesting an accommodation. (App. 08, Hughes Decl. ¶ 18). Instead of providing the necessary training to empower the clients so they can become self-sufficient, Grady only provided resources and referrals. (App. 08, Hughes Decl. ¶ 18).

On February 18, 2022, Grady refused to provide services to a hard of hearing client before the client provided proof of their hearing status. (App. 08, Hughes Decl. ¶ 19). Verification of hearing status is not required under DAC's policy or the Specialist Contract. (App. 08, Hughes Decl. ¶ 19). Grady only requested proof of the client's hearing status because the client identified as hard of hearing. (App. 08, Hughes Decl. ¶ 19). As a result of Grady's behavior, Martinez, met with Grady to discuss the incident. (App. 08, Hughes Decl. ¶ 19). During the meeting, Martinez

informed Grady to treat the client as she would treat any other client.[4]  (App. 08, Hughes Decl. ¶ 19).

On March 24, 2023, Grady received a Letter of Reprimand for failure to properly serve a hard of hearing client. (App. 09, Hughes Decl. ¶ 20). In January of 2023, a client contacted Grady to setup an appointment to meet. (App. 09, Hughes Decl. ¶ 20). Prior, the client experienced a job loss that was potentially due to the client's hearing status. (App. 09, Hughes Decl. ¶ 20). Grady and the client were scheduled to meet on February 3, 2023. (App. 09, Hughes Decl. ¶ 20). Later, Grady informed the client that she could no longer meet. (App. 09, Hughes Decl. ¶ 20). However, instead of rescheduling the meeting, Grady instructed the client to reach out to the Technology Specialist. (App. 09, Hughes Decl. ¶ 20). Technology specialists are responsible for assessing the technological needs of deaf and hard of hearing people. (App. 09, Hughes Decl. ¶ 20). They are not responsible for informing clients about their legal rights or the accommodation process, and do not have the expertise to do so. (App. 09, Hughes Decl. ¶ 20).  Due to Grady referring the client to another department, the client did not receive valuable information regarding her legal rights. (App. 09, Hughes Decl. ¶ 20). As a result of Grady's inaction, she received a Letter of Reprimand and attended a meeting with Martinez and Hughes. (App. 09, Hughes Decl. ¶ 20). During the meeting, Grady was reminded, that as the Access Specialist, she must assess the client's needs before she refers them to another department. (App. 09, Hughes Decl. ¶ 20). Also, Grady must inform the client of their legal rights. (App. 09, Hughes Decl. ¶ 20).

---

[4] Of note, in connection with the temporary restraining order, Grady introduced documentation that attempts to show Hughes requiring verification of hearing status from a client. It is anticipated that Grady will allege that she was acting at the direction of Hughes in this particular instance of requesting verification of a client's hearing loss.  On the contrary, the information presented by Grady is distinguishable because in that particular instance, the client had already been accepted as a DAC client – the information was not requested to verify the client's hearing status as a condition to services. Regardless, as set forth below, this is not an adverse employment action.

Grady filed her charge of discrimination on April 19, 2023 and her lawsuit on May 20, 2024. (App. 09, Hughes Decl. ¶ 21). The charge of discrimination is attached as Exhibit C.

On August 5-7, 2024, DAC held a case management training for its employees. (App. 09, Hughes Decl. ¶ 22). The purpose of the case management training was to continue to teach the client centered approach required by the State and nonprofit funders. (App. 09, Hughes Decl. ¶ 22). However, during the training, Grady was disruptive and argumentative. (App. 09, Hughes Decl. ¶ 22). In front of other DAC employees, she expressed how she did not agree with the client-centered approach because, in her opinion, it did not benefit her clients. (App. 09, Hughes Decl. ¶ 22).

On August 21, 2024, Grady informed Martinez that she directed a client to a specific dental office based on their reputation for being deaf-friendly. (App. 10, Hughes Decl. ¶ 23). As a result of Grady's conduct, Martinez reminded Grady that she cannot refer clients to a single service provider and must abide by the neutrality requirement. (App. 10, Hughes Decl. ¶ 23). Also, Martinez reminded Grady that she has had several individual and group trainings about this expectation. (App. 10, Hughes Decl. ¶ 23). As a result, Grady was informed that continued violations would result in disciplinary action, up to and including termination. (App. 10, Hughes Decl. ¶ 23). Although Grady acknowledged that her conduct was wrong, she insisted that it was the right course of action, and she would continue to take similar action from now on. (App. 10, Hughes Decl. ¶ 23). It is anticipated that Grady may argue that giving a client one option for a service does not violate the neutrality provisions of the Specialist Contract because the client has a choice to not use that provider. (App. 10, Hughes Decl. ¶ 23). However, that is not how DAC interprets or understands the neutrality requirements of the Specialist Contract. (App. 10, Hughes Decl. ¶ 23).

On August 29, 2024, Hughes informed staff that DAC would be conducting an internal compliance audit, which would include a "[r]review of cases to determine if case language is appropriate and provide one-on-one coaching on improving case notes for coaching and strategic purposes." (App. 10, Hughes Decl. ¶ 24). That review was conducted was in fact conducted in the Fall of 2024, during which time Martinez provided feedback to the Access Specialists on significant challenges with their documentation practices and compliance with Specialist Contract requirements. (App. 10, Hughes Decl. ¶ 24).

During late October 2024/early November, Hughes discovered even more challenges with Grady's performance and conduct. (App. 10, Hughes Decl. ¶ 25). For example, DAC received subpoenas from a law firm requesting documents for two DAC clients that were assigned to Grady. In preparing responses to the subpoenas, Hughes realized that Grady violated the Specialist Contract by again, inserting herself in client legal matters instead of following the client-centered approach, and on which she had been regularly trained. (App. 10, Hughes Decl. ¶ 25).

In late October 2024, Grady's supervisor, Martinez, initiated a meeting with the Access Specialists (Grady and Bianca Walker). (App. 11, Hughes Decl. ¶ 26). The purpose of the meeting was to discuss continued challenges with case notes and the Access Specialist's failure to follow direction related to client-centered advocacy (*i.e.*, empowering clients to advocate for themselves and not making clients reliant on the Access Specialist or having the Access Specialist insert themselves into client matters, including legal matters). (App.11, Hughes Decl. ¶ 26). The meeting was conducted on November 4, 2024. The attendees of the meeting included Hughes, Martinez, Paul Hagerty ("Hagerty"), Human Resources, the Access Specialists, including Grady, and a non-employee sign language interpreter. (App. 11, Hughes Decl. ¶ 26). During this meeting, Grady was combative and acted in an unprofessional manner. (App. 11, Hughes Decl. ¶ 26). More

specifically, instead of receiving feedback constructively, Grady unnecessarily divulged confidential and sensitive information about another employee during the meeting, and weaponized it in a way that was hurtful and unnecessary, causing a strain on the ability of that employee to work with Grady. (App. 11, Hughes Decl. ¶ 26). Information regarding this incident is attached as Exhibit A-24 and filed under seal. The incident resulted in an employee complaint about Grady and her use of highly personal, sensitive, and confidential information, in a way that was received by the employee whose information was used as hurtful and undermining. App. 11, Hughes Decl. ¶ 26). Around this time, Martinez informed Hughes that she was thinking of resigning because of reoccurring performance and conduct challenges with Grady and the other Access Specialist. (App. 11, Hughes Decl. ¶ 26).

Hagerty investigated the employee complaint, completing his portion of the investigation on or about November 11, 2024. App. 11, Hughes Decl. ¶ 27). Hagerty talked to several witnesses including Martinez, Hughes, Grady, Bianca Walker (Access Specialist), and Aisha Simpson (interpreter). (App. 11, Hughes Decl. ¶ 27). The multiple witnesses confirmed Grady acted unprofessionally and violated DAC's policies and/or expectations related to respectful workplace behavior and confidentiality. (App. 11, Hughes Decl. ¶ 27). On November 11, 2024, Grady was placed on administrative leave pending the conclusion of the investigation and to allow for appropriate follow up. (App. 11, Hughes Decl. ¶ 27). Although Hagerty had completed his interviews in response to the November 6, 2024 complaint, DAC was still evaluating Grady's employment status given the November 6 incident as well as Grady's ongoing performance challenges. (App. 11, Hughes Decl. ¶ 27).

For example, on or after Grady was placed on administrative leave, issues with Grady's behavior continued to be unveiled in the normal course, such as an instance where Grady would

hide events from the public calendar, used DAC interpreting services for events at state-funded institutions after a similar request after a similar request had been denied, and got involved to an inappropriate degree in client EEOC matters. (App. 12, Hughes Decl. ¶ 28).

During this time frame – and before Grady sought injunctive relief – Hughes made the decision to terminate Grady because of ongoing concerns with Grady's performance and conduct, which had not improved despite years of instruction, training, coaching, and performance related feedback on job expectations, Specialist Contract Requirements, and appropriate conduct. Hughes also considered Hagerty's input on his investigation of Grady's conduct in the November 4 meeting. (App. 12, Hughes Decl. ¶ 29). Grady's continued failure to follow direction and lack of professionalism had resulted in an unnecessary allocation of resources for a small organization such as DAC to manage the impacts of her behavior with internal stakeholders (e.g., strain on other employees such as Grady's direct supervisor) and external stakeholders (e.g., working with contacts at ODHHS to cautiously confirm DAC's interpretation of State requirements in response to Grady's failure to adhere to or challenge to those requirements). (App. 12, Hughes Decl. ¶ 29). Grady's failure to adhere to contract requirements created challenges for DAC to bill its services to the Specialist Contract that funds Access Specialist services. (App. 12, Hughes Decl. ¶ 29). In short – and unrelated to any alleged request for accommodation, charge of discrimination, lawsuit, or attempt to exercise her legal rights or protected activity – Grady repeatedly acted in a manner that does not align to DAC's mission and/or the Specialist Contract and created significant challenges for and harm to DAC, including but not limited to unnecessary risks to DAC's funding, compliance efforts, resources, and internal and external relationships. (App. 12, Hughes Decl. ¶ 29). In addition to harming DAC, such conduct interferes with DAC's ability to serve the deaf community. (App. 12, Hughes Decl. ¶ 29).

DAC was in the process of formalizing the termination decision when Grady filed a request for a temporary restraining order on November 26, 2024. (App. 13, Hughes Decl. ¶ 30). DAC paused any decision pending the outcome of the preliminary injunction out of an abundance of caution until a ruling could be delivered by the Court. (App. 13, Hughes Decl. ¶ 30). However, given the ongoing performance challenges exhibited by Grady, including but not limited disrespectful behaviors, highly personalized attacks on her direct supervisor, and her failure to follow direction related Specialist Contract requirements such as neutrality and client-centered advocacy as well as case documentation requirements, DAC will suffer irreparable harm if it is required to reinstate Grady. (App. 13, Hughes Decl. ¶ 30). Since Grady was placed on administrative leave, DAC has taken steps to fill the Access Specialist role. (App. 13, Hughes Decl. ¶ 30). More recently, DAC is navigating significant challenges to its funding in light of uncertainty in the nonprofit sector, which will be impacted by the current State legislative session. (App. 13, Hughes Decl. ¶ 30). DAC simply does not have the financial ability or management resources to reinstate an employee like Grady who has exhibited unprofessional behaviors towards others (putting DAC at risk of losing key employees) and who repeatedly fails to follow direction that is directly related to the sort of nonprofit funding that helps DAC keep its doors open and serve the deaf community. (App. 13, Hughes Decl. ¶ 30).

**F.** **Grady's Claims of Disability Discrimination are Based on Incidents Where She was Either Unsatisfied with the Provided Interpreters or Did not Want to Communicate in Written English with Clients**

As an Access Specialist, part of Grady's responsibilities is to give trainings to different governmental agencies such as courts, school systems, and institutions of higher education. (App. 13, Hughes Decl. ¶ 31). Although Grady claims in her Complaint that she was not offered ASL interpreters during these presentations and trainings, at her deposition, Grady could not recall a

single time where she was not provided an ASL interpreter for these presentations and trainings. (App. 13, Hughes Decl. ¶ 31; App 168, Grady Depo. pp. 86:22-86:25). In fact, Grady could only recall not being satisfied with some of the ASL interpreters provided. (App. 13, Hughes Decl. ¶ 31; App. 169, Grady Depo. pp. 87:2-87:9). But of note, Grady is not without agency in facilitating interpreters for such trainings. (App. 13, Hughes Decl. ¶ 31). The Access Specialist plans for these trainings and has the ability to confirm that interpretation needs have been satisfied through proactive communication with the entity hosting the training. (App. 13, Hughes Decl. ¶ 31). Also, as previously noted, the Specialist Contract makes clear that with respect to interpreter services, DAC should "[n]ot assume an entity's responsibility for providing interpreting or CART services for an entity's service provision responsibilities." (App. 13, Hughes Decl. ¶ 31). Stated differently, for trainings such as these, DAC should not always be proving and/or funding the interpretation services. (App. 13, Hughes Decl. ¶ 31).

Grady also alleges that she was not provided ASL interpreters during her meetings with hard of hearing clients and alleges that she had to request DAC employees to provide interpreting services. (App. 14, Hughes Decl. ¶ 32). Any such request is inappropriate. (App. 14, Hughes Decl. ¶ 32). DAC employees should not be used as interpreters because they are not impartial. (App. 14, Hughes Decl. ¶ 32). Also, DAC employees have their own job responsibilities and interpreting for co-workers takes time away from their ability to meet the requirements of their own positions and DAC other business, creating an undue hardship on the organization. (App. 14, Hughes Decl. ¶ 32).

Finally, Grady's essential job duties include being able to effectively communicate in written English to communicate with hard of hearing clients. (App. 14, Hughes Decl. ¶ 33). Per DAC's policy and as a best practice, all Access Specialists must communicate with hard of hearing

clients in written English. (App. 14, Hughes Decl. ¶ 33). Hard of hearing clients have various degrees of hearing loss, from slight to profound. App. 14, Hughes Decl. ¶ 33). Due to this variation in hearing loss, DAC is unable to know which degree of hearing loss a particular client has at any given moment. (App. 14, Hughes Decl. ¶ 33). For the best opportunity of effective communication for both employees and the hard of hearing client, DAC requires all Access Specialists to communicate in written English with clients, at least until their needs have been assessed. (App. 14, Hughes Decl. ¶ 33). Given cost considerations, providing ASL interpreters for every client communication is simply not practical and would create an undue hardship for the organization. (App. 14, Hughes Decl. ¶ 33). DAC has had to cut programs and services over the past 4-5 years, at various points in time, due to financial limitations and is currently navigating a period of funding uncertainty. (App. 14, Hughes Decl. ¶ 33).

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the evidence shows that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Once the moving party has made an initial showing, the burden shifts to the party opposing the motion to proffer evidence that establishes the existence of genuine fact issues regarding each challenged element of the party's case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995). To this end, the nonmovant must come forward with specific facts that present material issues sufficient that a jury might return a verdict in his favor and "articulate the 'precise manner' in which that evidence support[s] her claim[s]." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

When the record taken as a whole cannot "lead a rational trier of fact to find for [p]laintiff," there is "no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "The burden on [plaintiff] is to do more than simply show that there is some metaphysical doubt as to the material facts." *Meinecke v. H&R Block*, 66 F.3d 77, 81 (5th Cir. 1995). "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden" on summary judgment. *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (quotation marks and citation omitted).

## IV.    AUTHORITIES AND ARGUMENTS

### A.    DAC Did Not Discriminate Against Grady Based on Her Disability

Grady alleges DAC took adverse employment actions against her based on her disability, but there is no such evidence. First, Grady's disability discrimination claim appears to be entirely based on the alleged failure to accommodate. Regardless, even if she were to contend that DAC's efforts to manage her job performance or her current employment status are based on her disability, there is no evidence of discrimination beyond speculation and conjecture. As set forth in more detail below, DAC at all times acted based on legitimate, non-discriminatory motives with respect to decisions impacting Grady's employment.

#### 1.    Grady Cannot Establish a *Prima Facie* Case of Disability Discrimination

To establish a *prima facie* case of disability discrimination under the Americans with Disabilities Act ("ADA"), Grady must prove: (1) that she has a disability; (2) that she was qualified for the job; and (3) that she was subject to an adverse employment decision because of her disability. *See E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 700 (5th Cir. 2014). If she makes such a showing, a presumption of discrimination arises, and the employer must "articulate a legitimate non-discriminatory reason for the adverse employment action." *Id*. The burden then shifts to the

plaintiff to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual. *Id.* As with discrimination cases generally, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 143 (2000).[5]

As an initial matter, it is unclear from both the face of Grady's Original Complaint and her deposition testimony what specific adverse employment action she believes she was subjected to. Under the ADA, adverse employment actions include such things as demotions, refusals to promote, suspensions, reprimands, and discharges. *EEOC v. Cheveron Phillips Chem. Co., LP,* 570 F.3d 606, 622 (5th Cir. 2009). In Grady's Complaint, she points to two written warnings she received and also to being accused of not knowing how to work with hard of hearing clients and being locked out of her computer. (Compl. ¶¶ 13-14, 19-20, 25). But Grady ties every one of those allegations to her retaliation claim, not any allegation of disability discrimination. And it is Grady's burden to not only identify an adverse employment decision, but to identify one that was made "because of [her] disability." *Nall v. BNSF Ry. Co.,* 917 F.3d 335, 341 (5th Cir. 2019); *Williams v. J.B. Hunt Transp., Inc.,* 826 F.3d 806, 811 (5th Cir. 2016).

Further, even if Grady had alleged that the examples she provides in her Complaint were adverse employment actions, the disability discrimination claim would still fail because "an employment action that does not affect job duties, compensation, or benefits is not an adverse employment action." *Pegram v. Honeywell, Inc.,* 361 F.3d 272, 282 (5th Cir. 2004) (internal

---

[5] Grady also brings a claim for disability discrimination under Chapter 21 of the Texas Labor Code. The purpose of Chapter 21 of the Texas Labor Code is to implement the policies of the ADA. Tex. Lab. Code § 21.001(1). Texas courts follow ADA law when evaluating claims under Chapter 21. *Pegram v. Honeywell, Inc.,* 361 F.3d 272, 285-87 (5th Cir. 2004); *Clark v. Champions Nat'l Security, Inc.*, 952 F.3d 570, 578 n.16 (5th Cir. 2020) (the analysis of plaintiff's disability discrimination claim under the ADA likewise applies to her claim under the Texas Labor Code).

quotations omitted). The only thing Grady points to in her Complaint that may appear to be an adverse employment action are the two written warnings she received. The first written warning was on August 31, 2019, and the second was on March 24, 2023.[6] (Compl. ¶ 14, 25). "Disciplinary warnings and negative performance evaluations do not constitute actionable adverse employment actions." *Young v. Dall. Indep. Sch. Dist.,* No. 3:16-CV-543-N-BF, 2017 U.S. Dist. LEXIS 159380, at*8 (N.D. Tex. Sep. 6, 2017) (*adopted by* 2017 U.S. Dist., LEXIS 158135 (N.D. Tex. Sept. 27, 2017)) (J. Godbey).

Recently, in *Muldrow v. City of St. Louis*, the Supreme Court addressed adverse employment actions for purposes of Title VII discrimination. *Muldrow v. City of St. Louis*, 601 U.S. 346, 347 (2024).[7] The Court held that even though "an employee must show some harm" from the asserted adverse employment action, "she need not show that the injury satisfies a significance test." *Id.* at 350. "The phrase, 'terms or conditions of employment,' requires employees to show that the asserted adverse employment action 'brought about some disadvantageous change in an employment term or condition.'" *Bravo v. Kendall*, No. 5:22-CV-1186-JKP, 2025 U.S. Dist. LEXIS 59747, at *95 (W.D. Tex. Mar. 31, 2025) (interpreting the Rehabilitation Act, which mirrors the ADA, and quoting *Muldrow*, 601 U.S. at 354). Assuming for purposes of argument that *Muldrow* applies in the context of ADA discrimination claims, evidence of a disadvantageous change in the terms and conditions of Grady's employment is lacking here. Grady did not suffer a change to her pay, job responsibilities, or job title in response to the 2019 written warning or any of the other matters challenged in the Complaint. (Compl. ¶¶

---

[6] The allegation that the first written warning issued in 2019 was discriminatory or retaliatory is time barred because it was not raised in a timely filed charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1); *Julian v. City of Houston*, 314 F.3d 721, 726 (5th Cir. 2002) (under federal law, a plaintiff must file their charge of discrimination within 300 days of the alleged unlawful employment practice or it is time barred). Here, Grady did not file a charge of discrimination until April 2023.

[7] The Fifth Circuit regularly applies Title VII standards to ADA claims. *Stringer v. N. Bolivar Consol. Sch. Dist.*, 727 F.App'x 793, 799 n.3 (5th Cir. 2018); *see, e.g., EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

13-14, 19-20). And any humiliation or displeasing feelings Grady may have experienced as a result of the written warning—or from the accusation of not knowing how to work with hard of hearing clients and being temporarily locked out of her computer while she was on a vacation—is merely "an unpleasant workplace experience, not an adverse employment action." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019). Alternatively, even if the challenged actions were considered adverse, Grady has not introduced any evidence or argument that these actions were taken on the basis of her disability. Nor is there any such suggestion. Grady reported to Martinez, who is deaf. Martinez, in turn, reported to Hughes, who is DAC's Executive Director (and who is also deaf). (App. 03, Hughes Decl. ¶ 5). Any suggestion that the two acted in a manner that was adverse to Grady because she too was deaf defies common sense and is entirely speculative.

### 2. DAC Acted on the Basis of Legitimate Reasons with Respect to the Administrative Leave/Failure to Reinstate

Although it is not mentioned in her Complaint, Grady has challenged DAC's decision to place her on an administrative leave and has argued for reinstatement. (ECF No. 21 at 13). As noted in DAC's briefing on the preliminary injunction, the decision to place Grady on administrative leave came on the heels of continued performance challenges and an employee complaint concerning her behavior, and reinstating Grady will result in harm to DAC. (ECF No. 22 at 14). As noted herein, DAC has paused implementation of Grady's termination pending the Court's ruling on Grady's preliminary injunction. (App. 12, Hughes Decl. ¶ 29).

Once again, because Grady cannot offer direct evidence of discrimination due to a disability, she must proceed under the *McDonnel Douglas* burden-shifting analysis. *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 764 (5th Cir. 2016). To carry her burden under this analysis, if DAC provides a legitimate, non-discriminatory reason for the action taken against Grady, she "must

rebut each nondiscriminatory . . . reason articulated by the employer." *McCoy v. City of Shreveport,* 492 F.3d 551, 557 (5th Cir. 2007). This she cannot do.

Assuming for purposes of argument that Grady can establish a *prima facie* case of discrimination based on the decision to place her on administrative leave and not reinstate her employment, DAC had a legitimate, non-discriminatory reason for doing so—namely her multi-year pattern of job performance and conduct issues. (App.7-11, Hughes Decl. ¶¶ 17-19, 21-27). In short, despite years of instruction, training, coaching, and performance-related feedback, Grady continued to not follow direction tied directly to the Specialist Contract and continued to engage in unprofessional and antagonistic behaviors, including an incident on November 4, 2024, where she weaponized highly sensitive and personal information regarding a co-worker in violation of policy, including policies related to conduct and confidentiality. (App. 10, Hughes Decl. ¶ 25). Grady repeatedly acted in a manner that does not align to DAC's mission and/or the Specialist Contract and that created significant challenges for and harm to DAC, including but not limited to unnecessary risks to DAC's funding, compliance efforts, resources, and internal and external relationships. (App. 7-11, Hughes Decl. ¶¶ 17-19, 21-27). In addition to harming DAC, such conduct interferes with DAC's ability to serve the deaf community. (App. 12, Hughes Decl. ¶ 28).

Based on DAC's stated, legitimate reason for the decision to place Grady on administrative leave and not reinstate her, the burden is on Grady to offer evidence to show that DAC's stated reason is pretextual and that the actual reason for those actions is because of her disability. But Grady has no such evidence, nor is there any suggestion that Grady's disability played a role in any decision affecting her employment. First, Grady ties her disability discrimination allegations to the alleged failure to accommodate. (App. 170, Grady Depo. pp. 176:10-16). Further, there is no suggestion of disability discrimination. Grady's disability is that she is profoundly deaf.

(Compl. ¶ 8). DAC is a small, non-profit organization whose entire mission is to advocate for the deaf community. (App. 2, Hughes Decl. ¶ 3). Most of DAC's employees are deaf or hard of hearing, and Grady's direct supervisor and DAC's executive director are deaf. (App. 2-3, Hughes Decl. ¶¶ 3, 5). Against that backdrop, Grady now finds herself tasked with the heavy burden of proving to the court that the real reason for her current status is not because of years of performance challenges and conduct issues, but because she is deaf. Both common sense and the undisputed summary judgment record indicate that DAC's stated reason for placing her on administrative leave is not at all pretextual. And "the question for summary judgment is whether a rational fact finder could find that the employer discriminated against the plaintiff [because of his disability]." *Pratt v. City of Houston,* 247 F.3d 601, 606 (5th Cir. 2001). No rational fact finder could find that DAC discriminated against Grady because she is deaf, and her claim of disability discrimination under the ADA cannot survive summary judgment.

## B.  DAC Accommodated Grady

Unable to point to an adverse employment action or prove that DAC's stated reason for her current employment status is a pretext for unlawful discrimination, Grady attempts to satisfy the third prong of her discrimination claim on a theory of "failure to accommodate." (Compl. ¶¶ 12-13, 27-29, 37, 55). For all the reasons explained below, Grady's failure to accommodate claim must fail.

### 1.  Legal Standard for Failure to Accommodate

To state a failure to accommodate claim, Grady must make prima facie showing that: (1) she is a qualified individual with a disability; (2) the disability and its consequential limitations were known by DAC; and (3) DAC failed to make reasonable accommodations for such known limitations. *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013). The ADA requires

employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). However, an employee is not entitled to an accommodation that would remove essential job functions. *Burch v. City of Nacogdoches*, 174 F.3d 615, 620-21 (5th Cir. 1999). Such an accommodation would not be reasonable. *Id*.

Summary judgment on Grady's failure to accommodate claim is appropriate because she cannot meet her initial burden of establishing a prima facie case. Grady argues that she was not provided a reasonable accommodation when DAC allegedly failed to provide an ASL interpreter to facilitate communications in trainings, employment activities, and to communicate with clients. (Compl. ¶¶ 12, 16-18, 22-24, 28). But dig an inch deep and problems emerge. Grady's requests for an ASL interpreter were only denied when the interpreter was unnecessary (*e.g.*, an interpreter was already provided) or providing one would remove an essential job function. Further, Grady had numerous, effective communication options at her disposal for work-related communications.

### 2. Grady Was Not Without Interpreters for Trainings and Presentations

Grady alleges DAC failed to provide her with the reasonable accommodation of providing her with interpreters for trainings and presentations she would be giving to hearing audiences. (Compl. ¶ 17). But it is undisputed that there was never a training or presentation that Grady went to on behalf of DAC where there was no interpreter provided.

> Q.     Let's just step back. Was there ever a training that you went to on behalf of DAC where there was no interpreter provided by DAC or the hosting entity?
>
> A.     No. I mean I couldn't give a presentation if there was no interpreter.

(App. 168-169, Grady Depo. pp. 86:21-25, 87:1). Stated differently, Grady's problem was not that

she was ever denied an interpreter—she admits that she was not—it is that she did not believe the interpreters provided were competent:

> Q. But there were four presentations, at least, that we've talked about . . . where you were dissatisfied with the interpreting that was provided.
>
> A. Yes. They provided the interpreters, but they were not competent. They couldn't even keep up with me. They didn't know vocabulary.

(App. 169, Grady Depo., pp. 87:2-9). But even if the interpreters used for trainings provided did not live up to Grady's standards, they were provided. Moreover, Grady was not without agency, and she could have communicated proactively with the outside entity hosting the training to confirm communication and interpretation needs. (App. 13, Hughes Decl. ¶ 30). All the same, the accommodation Grady requested—an interpreter—she got. Perhaps Grady would have preferred a different interpreter, but the ADA only "provides a right to a reasonable accommodation, not to the employee's preferred accommodation." *EEOC v. Agro Distribution LLC*, 555 F.3d 462, 471 (5th Cir. 2009).

### 3. Grady Had Tools to Communicate with Clients

Grady also asserts she was denied the reasonable accommodation of having an ASL interpreter to properly serve non-ASL users and hard-of-hearing clients. (Compl. ¶ 24, 28). First, it should be noted that it was an essential function of Grady's job to be able to communicate in written English with clients, as noted in the Access Specialist job description. (App. 3-4, Hughes Decl. ¶¶ 6-7). In that vein, "if an employer has prepared a written description before advertising or interviewing applicants for the job," then that "description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Further, although the employer's judgment is one of several factors courts consider to determine whether a function is essential, "[t]he text of

the ADA and its regulations require us to give greatest weight to the employer's judgment . . . ." *Weber v. BNSF R. Co.*, 989 F.3d 320, 325 (5th Cir. 2021) (internal quotations omitted) (quoting *Credeur v. Louisiana*, 860 F.3d 785, 792 (5th Cir. 2017)). Indeed, "[i]t is the *only* evidence the statute requires us to consider, absent a written job description." *Credeur*, 860 F.3d at 792.

Second, not all situations warrant the use of an interpreter. As the Second Circuit has appropriately recognized, "[p]er se rules are unreliable in the disability context, so ASL interpretive services may not *always* constitute a reasonable accommodation." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 96 (2d Cir. 2015) (emphasis in original). While ASL interpreters are valuable in many situations, interpreter mediated communication is not always the most effective or efficient. (App. 4, Hughes Decl. ¶ 7). In other words, context matters.

In fact, "[c]ircumstances can be conceived in which the provision of interpreters would be less obviously reasonable, or even plainly *unreasonable*, as when technical material cannot be fully and accurately communicated by ASL." *Noll*, 787 F.3d at 97. Interpreters introduce a third-party dynamic that may affect rapport, confidentiality, or client comfort—particularly in sensitive advocacy scenarios. (App. 5, Hughes Decl. ¶ 9). And as stated earlier, it can be quite challenging for hard-of-hearing clients who are not using sign language to hear interpreters clearly. (App. 4, Hughes Decl. ¶ 7). Additionally, scheduling interpreters can delay service delivery, which directly conflicts with the ODHHS contract's emphasis on timely access to services. (App. 5, Hughes Decl. ¶ 9).

Further, "not every person who is deaf or hard of hearing is able to understand ASL. Logistical constraints arising out of the job itself might also make ASL interpretation infeasible or unwieldy." *Noll*, 787 F.3d at 97. Indeed, some clients—especially those from mainstreamed educational backgrounds—prefer English based communication and find written exchanges to be

more natural. (App. 4, Hughes Decl. ¶ 8). DAC also considers the emotional impact on their clients who are grieving and experiencing loss related to their hearing. (App. 4, Hughes Decl. ¶ 8). Moreover, the positioning of sign language interpreters is often ineffective for hard-of-hearing clients, which complicates communication and exacerbates the grieving process that comes with losing their hearing. (App. 4, Hughes Decl. ¶ 8). Stated more plainly, there are a lot of factors to consider.

In this case, Grady would have liked to have had an ASL interpreter to communicate with clients, but she did not need one. She was still able to perform the essential functions of her job without an interpreter. She was able to effectively communicate with clients through written exchanges, which is recommended for hard of hearing clients because it improves clarity, efficiency, and documentation. (App. 5, Hughes Decl. ¶ 9). In fact, the use of an ASL interpreter with hard of hearing clients would have jeopardized the provision of services to the hard of hearing client and would remove an essential job function. Further, Grady had access to other communication tools in the workplace generally, such as VRS or virtual conferencing applications, some of which would allow her to use captions when working with a hard of hearing client. (App. 5, Hughes Decl. ¶ 10).

In sum, Grady was not denied reasonable accommodations. DAC is not required to provide Grady with her ideal or preferred accommodation, only a reasonable one. *Argo Distrib.*, 555 F.3d at 471. DAC is not required to eliminate essential job functions. *See* 29 C.F.R. § Pt. 1630, app. at 398; *Credeur*, 860 F.3d at 792. In short, Grady was able to effectively perform the essential functions of her job without an ASL interpreter.

### 4. Providing Grady an ASL Interpreter Would Create an Undue Hardship for DAC

Alternatively, providing Grady an interpreter for every client or internal DAC interaction is not reasonable and/or is an undue hardship. A "reasonable accommodation" is an adjustment to the job or surrounding circumstances that would enable a disabled but otherwise qualified employee "to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). "The accommodation offered 'does not have to be the best accommodation possible,' so long as it meets the employee's needs." *Allen v. United States Postal Serv.*, No. 21-30699, 2022 U.S. App. LEXIS 18347, at *5 (5th Cir. July 1, 2022) (quoting 29 C.F.R. Pt. 1630, App., § 1630.9). The employer "has the ultimate discretion to choose between effective accommodations" and is free to choose an "easier" or "less expensive" option. 29 C.F.R. Pt. 1630, App., § 1630.9. Again, Grady did not need an interpreter because she had several other ways to effectively communicate with clients and other DAC employees. (App. 5, Hughes Decl. ¶ 10). She could communicate with individuals outside of DAC who were not fluent in ASL through written exchanges, VRS, and virtual conferencing applications. The same options were available to her for interactions with DAC employees. Further, one hundred percent of DAC's employees are fluent in ASL. (App. 2, Hughes Decl. ¶ 3) All these options were effective and "easier" and "less expensive" for DAC. *Id.* This makes her request for an ASL interpreter unreasonable on its face.

Additionally, providing Grady with an interpreter for every client interaction or internal communication would create an undue hardship for DAC. The ADA defines "undue hardship" as "an action requiring significant difficulty or expense" when considered in light of the following factors: (1) the nature and cost of the accommodation needed; (2) the overall financial resources and number of employees of the affected facility and the effect on expenses, resources, and operation of the facility; (3) the employer's overall financial resources, number and type of

facilities, and number of employees; and (4) the type of operation run by the employer, including the composition, structure, and functions of the workforce." 42 U.S.C. § 12111(10)(A)-(B). These factors mirror the EEOC's enforcement guidance on the issue. *See EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA*, No. 915.002 (Oct. 17, 2002).

DAC is a small, non-profit organization with limited funds. In recent years, DAC's funding has waned or gone through periods of uncertainty. (App. 14, Hughes Decl. ¶ 32). Providing Grady with an interpreter—when there were other effective communication tools available to her—and paying for it would create an expense that would have a significant impact on an organization where every dollar counts. (App. 12, Hughes Decl. ¶ 29). There is also a nationwide shortage of qualified and certified interpreters, and, as a result, interpreters are typically booked weeks in advance. (App. 5, Hughes Decl. ¶ 12). This means securing an ASL interpreter for Grady every time she needed to communicate with a client or DAC employee would present "significant difficulty" for DAC. And having other DAC employees interpret for her—as she often tried to do with respect to client communications—is no solution either and creates an undue hardship on DAC. By having her peers interpret for her, it affects their performance and takes them away from their job responsibilities. And they just are not qualified to do so. They do not have the ethical understanding to not omit certain information either by error or intentionally, and it affects everyone involved—including the client. (App. 13, Hughes Decl. ¶ 31).

## C.     DAC Did Not Retaliate Against Grady for Requesting a Reasonable Accommodation

Grady asserts that DAC retaliated against her for requesting a reasonable accommodation. For all the reasons stated below, Grady's retaliation claim must fail.

## 1.  Grady Cannot Establish a Prima Facie Case of Retaliation

To establish a prima facie case of retaliation under the ADA, Grady must prove that: (1) she engaged in protected activity; (2) she was subjected to an adverse employment action; and (3) a causal connection exists between her participation in the protected activity and the adverse employment action. *See Holt v. JTM Indus. Inc.,* 89 F.3d 1224, 1226 (5th Cir. 1996). If Grady makes a prima facie case, DAC must articulate a legitimate, non-retaliatory reason for its action. *See Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 433 (5th Cir. 1995). Following the articulation of the non-retaliatory reason, Grady must prove the articulated reason is merely pretextual and that "but for" her protected activity, she would not have been placed on administrative leave. *See Ray,* 63 F.3d at 433. To defeat summary judgment, the plaintiff must produce substantial probative evidence that the proffered reason was not the true reason for the employment decision and that the real reason was her participation in the alleged protected activity. *See Chaffin v. John H. Carter Co.,* 179 F.3d 316, 319-20 (5th Cir. 1999); *see also Pineda v. United Parcel Serv., Inc.,* 360 F.3d 483 (5th Cir. 2004).[8]

Grady alleges that she was retaliated against for advocating for her accommodation needs and filing a charge of discrimination with the EEOC. (Compl. ¶¶ 13, 21). More specifically, Grady alleges this retaliation came in the form of harassment, attacks on her character and work performance, and a written warning. (Compl. ¶¶ 13-14). As stated earlier in section one of her disability discrimination claim (and incorporated herein by reference), none of the examples Grady provides are considered adverse employment actions. And unchanged by the *Muldrow* decision,

---

[8] The Fifth Circuit jointly interprets retaliation claims under the ADA and Rehabilitation Act. *See Frame v. City of Arlington,* 657 F.3d 215, 223 (5th Cir. 2011); *Hainze v. Richards,* 207 F.3d 795, 799 (5th Cir. 2000) ("Jurisprudence interpreting either section is applicable to both."); *Cohen v. Univ. of Tex. Health Sci. Ctr.,* 557 F.App'x 273, 277 (5th Cir. 2014). Therefore, DAC will not separately address Grady's claim for retaliation under the Rehabilitation Act, but it fails for the same reasons her ADA claim fails.

"[a] plaintiff seeking to establish a retaliatory adverse employment action must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826-27 (5th Cir. 2019) (internal quotations omitted). "Disciplinary warnings and negative performance evaluations do not constitute actionable adverse employment actions." *Young,* 2017 U.S. Dist. LEXIS 159380, at *8; *see also Perez v. Brennan*, 766 F. App'x 61, 64 (5th Cir. 2019) (warning letter was not an adverse employment action); *Thibodeaux-Woody v. Houston Cmty. Coll.*, 593 F. App'x 280, 286 (5th Cir. 2014) (a written reprimand, without evidence of consequences, does not constitute an adverse employment action); *Mendoza v. Bell Helicopter*, 548 F. App'x 127, 130 (5th Cir. 2013) (verbal counseling and a written warning are not materially adverse employment actions); *DeHart v. Baker Hughes Oilfield Ops., Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007) (written disciplinary warning is not actionable retaliation). "[I]t remains settled law that petty slight and *de minimis* conduct [do] not amount to an adverse employment action." *Stancu v. Hri Lodging/Hilton Garden Inn*, No. 3:23-cv-2566-K-BN, 2024 U.S. Dist. LEXIS 236273, at *13 (N.D. Tex. Nov. 20, 2024). In short, Grady cannot establish a prima facie case of retaliation based on the adverse actions noted in the Complaint.

### 2. DAC Placed Grady on Administrative Leave for a Legitimate Reason

The fact remains that the only adverse employment action Grady *may* be able to point to is being placed on administrative leave and DAC's failure to reinstate her. As set forth above, DAC has articulated a legitimate reason for putting Grady on administrative leave and not reinstating her—specifically, her continued pattern of performance challenges, not following policies and procedures, and a pattern of unprofessional behavior that most recently led to a complaint by

another employee. (App. 10, Hughes Decl. ¶ 25). Significantly, Grady has no evidence to rebut DAC's stated reasons for those actions. Indeed, the burden is on Grady to establish that her protected activity was the but-for cause of the adverse employment action. *See Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 436 (5th Cir. 2022). Not only that, but Grady must show substantial evidence of pretext. *See Jones v. Gulf Coast Restaurant Group, Inc.*, 8 F.4th 363, 369 (5th Cir. 2021).

In Grady's prior Motion for a Preliminary Injunction, she argues that the temporal proximity between her protected activity and being placed on administrative leave establishes pretext. *See* ECF No. 21 at 4. That is because on November 1, 2024 —after Martinez had tried to set up a meeting with Grady and her co-worker to discuss adherence to Specialist Contract requirements—Grady's counsel wrote to DAC's counsel about what he claimed were "ongoing retaliation concerns." *Id.* Ten days later, Grady was placed on paid administrative leave. The sending of the letter, on Grady's telling, constitutes another instance of protected activity. Assuming for purposes of argument that a counsel-to-counsel communication is protected activity, the problem for Grady is while close timing "is sometimes enough to establish causation at the *prima facie* stage. . . . temporal proximity alone is insufficient to survive summary judgment at the pretext stage in the absence of other significant evidence of pretext." *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 564 (5th Cir. 2019) (internal quotes omitted). And Grady has not provided "other significant evidence of pretext." *Shackelford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999). "Thus [she] is left with no evidence of retaliation save temporal proximity," which does not meet her ultimate burden of causation. *Strong v. Univ. Health Care Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007); *see also Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) (noting temporary proximity alone does not establish pretext for purposes of retaliation claim).

Further, prior to Grady's attorney sending the November 1 communication, Grady engaged in other protected activity. She filed a charge of discrimination on April 19, 2023 (in which she alleges that she engaged in protected activity as early as 2021), and she filed this lawsuit on May 20, 2024. In other words, there is no compelling timing here because Grady, by her own account, has been engaging in protected activity for years. Of note, the Fifth Circuit has held that a five-month lapse between the protected activity and adverse employment action is not close enough to establish a *prima facie* case of retaliation, let alone meet a plaintiff's ultimate burden of causation. *Id.* Grady's "evidence" of retaliation is lacking.

Also of note, Grady has not rebutted any of the stated reasons for putting her on administrative leave and not reinstating her to her duties. In fact, the only thing Grady offers—and can offer—by way of rebuttal is conclusory allegations, speculation, and conjecture:

> Q.     One of your claims is retaliation. Why do you believe you were retaliated against?

> A.     Well, I'm not the only one that feels that way, it -- it – obviously. There was a lot of retaliation, and I don't know. I mean, it started after I filed the suit with EEOC. Everything was after that. It just became more and more like with the policies and, you know, they were trying to clean up their mess. That's what it was. I mean, there was so much – they were so much better if they would just sit down and analyze themselves, as well, Heather herself.

(App. 170-171, Grady Depo., pp. 176:17-25, 177:1-3). It went on like this. Grady was asked several more times during her deposition to provide examples of retaliation, and she was not able to do so. *See* Grady Depo., pp. 177:4-25, 178:1-25, 179:1-25, 180:1-18. Summary judgment is appropriate "if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993); *Grimes v. Tex. Dep't of Mental Health*, 102 F.3d 137, 139-40 (5th Cir. 1996) (noting

that "unsubstantiated assertions are not competent summary judgment evidence" and "the non-moving party [must] present evidence—not just conjecture and speculation—that the defendant retaliated . . . against" her); *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996) (summary judgment is proper when the nonmovant does not provide sufficient evidence to support her subjective opinion). Based on Grady's failure to rebut the stated reasons for her administrative leave (and DAC's decision to terminate her employment subject to the Court's ruling on the preliminary injunction), her retaliation claim cannot survive summary judgment.

## D. Reinstatement is Not Feasible

Part of the relief Grady seems to be pursuing in this lawsuit is reinstatement. (ECF No. 21 at 13). Reinstatement is inappropriate when "discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy." *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822 (5th Cir. 1990) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1449 (11th Cir. 1985)). Here, reinstatement is not feasible. First, DAC did not discriminate or retaliate against Grady. Second, if DAC were to reinstate Grady, morale problems would ensue, and "there is less likelihood than ever that plaintiff could be a satisfactory employee with defendant." *Id.* Grady has exhibited a multi-year pattern of unprofessional, insubordinate, and disruptive behavior and failure to adhere to Specialist Contract requirements, and that has created challenges for DAC with respect to internal and external stakeholders. (App. 12, Hughes Decl. ¶ 28). At least one DAC employee, Martinez, expressed her desire to resign because of Grady's continued performance and conduct challenges. (App. 10, Hughes Decl. ¶ 25). "[H]ostility between the parties that is likely to disrupt the workplace if the employee returns can be a reason for denying reinstatement." *Bogan v. MTD Consumer Grp., Inc.*, 919 F.3d 332, 338 (5th Cir. 2019). Simply put, there is too much acrimony, and it would be too disruptive to reinstate Grady. All the reasons Grady was put on leave are all

the same reasons why she cannot be allowed to return. And finally, but not insignificantly, DAC has had to take steps to fill the Access Specialist role, and its funding is uncertain and will remain so until at least the end of the current legislative session. (App. 12, Hughes Decl. ¶ 29). DAC would be irreparably harmed if it were required to reinstate Grady.

E.     **The Rehabilitation Act and Texas Labor Code Claims Fail**

Grady alleges DAC discriminated against her based on her disability and retaliated against her in violation of Section 504 of the Rehabilitation Act. To establish a prima facie case of discrimination under the Rehabilitation Act, Grady must show: (1) she has a disability; (2) she was "otherwise qualified" for the job; (3) she worked for a program or activity that received federal financial assistance; and (4) DAC took adverse action against Grady *solely* because of her disability. *Chandler v. City of Dall.*, 2 F.3d 1385, 1390 (5th Cir. 1993) (emphasis added). "The language in the ADA generally tracks the language set forth in [§ 504]." *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002). "And the ADA expressly provides that '[t]he remedies, procedures, and rights' available under the Rehabilitation Act are also accessible under the ADA." *J.W. v. Paley*, 81 F.4th 440, 449 (5th Cir. 2023) (quoting 42 U.S.C. § 12133). Thus, the Fifth Circuit "equates liability standards under § 504 [of the Rehabilitation Act] and the ADA." *D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 627 F.3d 450, 453 (5th Cir. 2010). Grady's Rehabilitation Act claims fail for all the reasons her discrimination/failure to accommodate and retaliation claims fails pursuant to the ADA. In fact, the standard under the Rehabilitation Act is more stringent than the standard under the ADA. Section 504 requires that Grady's disability be the "sole reason" for the exclusion or denial of benefits. *Chandler*, 2 F.3d at 1390. This bar is too high for Grady to clear, and her claim cannot survive summary judgment.

Grady also brings a claim for disability discrimination under Chapter 21 of the Texas Labor Code. The purpose of Chapter 21 of the Texas Labor Code is to implement the policies of the ADA. Tex. Lab. Code § 21.001(1). Texas courts follow ADA law when evaluating claims under Chapter 21. *Pegram v. Honeywell, Inc.,* 361 F.3d 272, 285-87 (5th Cir. 2004); *Clark v. Champions Nat'l Security, Inc.*, 952 F.3d 570, 578 n.16 (5th Cir. 2020) (the analysis of plaintiff's disability discrimination claim under the ADA likewise applies to her claim under the Texas Labor Code). Therefore, her claims under Chapter 21 of the Texas Labor Code also must fail.

### V.    CONCLUSION

For all the reasons set forth above, Defendant Deaf Action Center requests that the Court grant its motion for summary judgment on all of Grady's claims and for such further relief as the Court deems just and proper.

Respectfully submitted,

By: */s/ Kristin L. Bauer*
Kristin L. Bauer
Texas State Bar No. 24006813
kristin.bauer@jacksonlewis.com
Keshia N. Barnes
Texas State Bar No. 24089010
keshia.barnes@jacksonlewis.com
Justin Sassaman
Texas Bar No. 24143383
Justin.sassaman@jacksonlewis.com

Jackson Lewis P.C.
500 N. Akard Street, Suite 2400
Dallas, Texas 75201
Telephone:    (214) 520-2400
Facsimile:    (214) 520-2008

**ATTORNEYS FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document has been served by filing with the ECF filing system on this May 6, 2025, which will cause service to be made upon the following:

Andrew Rozynski, Esq.
Eisenberg & Baum, LLP
24 Union Square East, Fourth Floor
New York, New York 10003
arozynski@eandblaw.com


*/s/ Kristin L. Bauer*
Kristin L. Bauer


4916-8345-9904, v. 1